Your Honor, would it be possible to reserve two minutes for rebuttal? What would be possible? Do you want to do that? You just want to ask a simple question about the possibilities one faces in life? No. With all respect, I ask to reserve two minutes. That's not possible. Okay. All right. We have two minutes. It will be probably impossible for us to hold you. Yeah, it probably will be. You would lift the microphone a little so students can hear. May it please the Court. My name is Edward J. Kucha, and I represent the petitioner, Reedy Shireesha. Ms. Shireesha was an applicant for adjustment of status here in the United States. Am I missing something here? This is every now and then. It doesn't happen often, but every now and then we'll see an immigration case, at least for myself, scratching my head, saying, one, this is a software engineer. What is the government's interest in sending her out of the country? Two, the government told her she could leave. She did everything she needed to do. She jumped through all the hoops that are there to jump through, and there are sizable and formidable hoops. She dabbed her eyes, crossed her teeth, only to find out that perhaps because she had followed the rules, the ultimate rule is now catching up to her, and she can't adjust status. I would agree completely, Your Honor, yes. You can sit down. The problem is the statute. How do we read the statute in order to avoid almost a cough, not almost, it is a cough as a result. I'm sorry, before you get to that, there is one hitch, and that is the notice that she was told that she may be in trouble if she left the country. Perhaps I could address that then first. That notice, that advanced parole notice, does state, in fact, it states specifically, presentation of this authorization, the advanced parole document, will permit you to resume your application for adjustment of status. It then goes on to say if you were unlawfully present for more than a certain period, you may be inadmissible. And those are powerful words, will be permitted versus may be inadmissible. Well, but the may be depends upon how long she had been here. I mean, there are little requirements and things that must be satisfied, but it did put her on notice that you may be, so you need to inquire further. Now, I think it would have been better if the notice actually said what B2B says, rather than say some statute. Section 212A9BI. But as Judge Sirica notes, there are these seemingly conflicting statements that would make her pause and call a lawyer, I guess. Well, sadly, she was represented happily not by me. I did take over a bit later. Happily for you, not happily for her. Correct. Somebody took the trouble of getting her the advanced parole, which is terrific. It is. Precisely. And I think perhaps one of the dangers here is that the applications had been pending for so long that she needed to visit her family and friends back home. But she did see a lawyer. She thought she was doing everything right. And then, bam, she was hit with this horror that has occurred ever since. How do we get around Padilla? And why isn't this case more like Padilla than the Seventh Circuit case? Certainly, there is an interesting ramification there. Yeah, it's interesting because you lose. Clearly, she was ineffectively represented. Nonetheless, we would argue that that notice, that may, the may language, would serve to excuse in this case because the will language, I would hold, is more powerful. Well, you will, but then the next sentence is, but then again, be alerted. If you fit in a certain category, this might not apply. You have to read the fine print. There's no question. But if I may, Judge, there are other ways perhaps around this, and that perhaps is the interplay between those numbers, the 8212A9BII statute and 245I, the LIFE Act. And the LIFE Act perhaps could allow us some, I suppose, wiggle room here. There is no question that another – I can explain that because the LIFE Act specifically says, basically, that the provisions of this act don't trump other acts under which you might be inadmissible, and this is clearly the act that applies here. Well, if I may, the LIFE Act provides that persons who are here in the United States illegally, unlawfully, they've overstayed a visa, they entered without authorization, can, by paying a penalty, overcome that inadmissibility. And Ms. Sherisha has utilized the LIFE Act to begin this application process, and it is a very complicated application process. There is another section that is very, very similar, and this is what the Lima's court in the Seventh Circuit, what they fixed upon. There is another section, the 9C section, the 2212A9CI section, forgive me if I'm mistaking the numbers, but I believe I did that correctly, which speaks to recidivist immigration violators. And there's been a good number of cases that have come down that says the LIFE Act does not protect or does not trump recidivist immigration violators. Most of the efforts of the courts and the BIA has really focused upon these recidivist violators. They also talk about LIFE family reunification, and that the policy behind this entire thing is family reunification, which at least as far as the record for us, unless I missed it, that's not what the issue here is. It's not a situation where she went back to reunite with her family. I don't know why she went back, but she went back for some, obviously, personal reason. So that language, which is helpful to you, really is not floating around here. Correct. No, in terms of policy, it would seem that somebody in her position should be able to do exactly what she did and should not have to pay a penalty. But I'm having trouble seeing where the statute says that, and particularly having trouble with the Chevron deference as well on the statutory interpretation. Perhaps, again, if I may, the interplay between those two inadmissibility sections, I was speaking of the 212A9C section and the B sections, perhaps that could be the way to get around this. Specifically, again, the 9C section again speaks to the recidivist violators. That's not the case here. There are two separate inadmissibility sections. Yeah, but the problem is both of them are under a statutory lead-in that talks about these classes are ineligible for admission. So it's grouping them all together. And the BIA says they're all grouped together, it doesn't matter, B and C are the same. We'd need to find that that's a, I mean, the Seventh Circuit, Judge Wood made a really good stab at this makes no sense. Right. But I don't, I think it's very tough to say it's arbitrary and capricious and there's just no, it's not a reasonable reading given the ambiguity. I would think that there's a possibility here that the BIA wasn't really focused on her particular circumstances. And maybe the reading of the statute to apply to her would be unreasonable and arbitrary given the fact that your standard run-of-the-mill person under either B or C has done some things that are wrong. Right. And she hasn't. Well, she stayed, she overstayed. Right. So no, joined the club, you know, she overstayed. But she came in, she has never entered illegally. Precisely. And the question, and she adjusted before, I mean, she moved to adjust before all this horrible stuff happened. Precisely. And that argument is made in your brief. I don't know if that timing really matters, but would that be a way to go to send it back to the BIA and say, you know, this just doesn't, this doesn't make sense. We're not saying your reading of B and C is, you know, is usually wrong, but, you know, isn't there a way to say that the real intent under B is that a person is coming in illegally when they seek admission? It's understood that there's an illegal entry here, and there is none. Is that possible? Absolutely. I would agree completely. There are significant – Thank you, Your Honor. There are significant equitable issues here. It may be a way of avoiding resulting in a DIA, because as I recall the alien there did come in initially illegally. Correct. All the cases that we've looked at, they're all – They're all illegal. Ms. Sherisha has never, ever sought or entered the United States illegally. The first time was with a valid visitor's visa, and the second was, sadly, with the advanced parole. And that would be perhaps the – there are two equitable avenues. One, of course, would be the estoppel argument, which is a fairly high burden, there's no question. But that would be one, perhaps, resolution to this case. Another case is reaching back into even older law, the Nuk-Pro-Tunk Doctrine, which we've talked about and the BIA gave short shrift to. But that does – it exists. It does allow for resolution of unusually harsh immigration consequences. And there has been significant case law over the years applying the Nuk-Pro-Tunk Doctrine, the idea being that using this equitable remedy that we could overcome, again, a very harsh immigration consequence, usually in the idea of a waiver consequence, that a person needs to get a waiver of whatever thing they've done. Does that argue to the BIA? Yes. Yes, very definitely. Yes, to the immigration court and to the BIA. As – does the attorney general or the INS here have the authority to adjust this relief if they wish? I would argue yes. I would definitely argue yes. No, answer the question. No, you told us what you would argue. There we go. And, again, I would argue with those two. Again, if we're going to move away from the legal arguments and move into the equitable range, then, of course, they could choose to use this Nuk-Pro-Tunk argument. They could find themselves estopped or your honors could find them estopped from enforcing this waiver against them. Certainly the idea that taking advanced parole in these kinds of circumstances, that it's almost a bait and switch. Except for that wording in the notice, which is almost worthless, but it does say you may not be able to come back in. If that wasn't there, you clearly – you'd have a winner. You would have an estoppel because you'd have an affirmative act. You could argue she relied upon it. She clearly, I guess, would have relied upon it and would have misled her to her detriment. But that may provision with the unfathomable language in the notice, at least to my mind, is unfathomable. I can't – I have difficulties for me to keep these statutes straight. And you've had trouble referring to 9 versus B and A and C. And the way that notice is worded, it may be inadmissible under 212A9BI after being told this authorization will permit you to resume your application for adjustment upon your return. To make it even worse, she was found inadmissible under 212A9BII. Three I's, not even the one that they cited. Nonetheless, and even in that notice, it does talk about other things that could go wrong. They say, for example, if your adjustment application is denied, that you might be subject to removal proceedings. So it is possible that this could be read to say these are just catch-all doomsday scenarios and that further supporting my assertion that the government should be stopped here from finding Ms. Cherisha inadmissible. At least that would be my contention. Thank you. Thank you. Mr. Glenn. Good morning, Your Honors, and may it please the Court, my name is Patrick Glenn here on behalf of the Attorney General. What am I missing? Why is it in the interest of the United States to send this talented software engineer who has a job, whom her employer wants to remain, to remove her or deport her after she did everything she had to do? She overstayed her visa, obviously we wouldn't be here. But beyond that, she jumps through all these hoops that are there, she got a piece of paper allowing her to leave, and based upon this incredibly technical and intricate wording and the interplay of these two statutes, the government is seeking her to remove her. Why is the government interested in doing this? Well, the question of removal is certainly within the firm discretion of the Department of Homeland Security. Yeah, why is it exercising its discretion in this, at least in my mind, apparently asinine manner? Let me ask it that way. I can't answer exactly why the department took the actions it took in this case. I know that Petitioner is removable under the charge ground and there are no barriers to that removability. She does fit that. Well, I'm not sure there are no barriers to that removability. It depends on what comes out of this appeal. Maybe the Seventh Circuit is right. You're looking at three barriers right here. Yeah, if we follow the Seventh Circuit, she would stay here. Yeah, that is true, Your Honors, and there are no compelling reasons for taking that course of action, not least because the Seventh Circuit did not undertake the appropriate deferential analysis of the Board's decision in that case. Well, you know, we understand your argument, but that does not necessarily mean that we don't agree. Well, I'd like to point out several, Your Honor. Yeah, why would Chevron apply? Chevron doesn't apply if the agency's interpretation of a statute leads to an illogical result. Chevron deference doesn't apply. And I'm not sure we get a much more illogical result than what happened to this person who entered legally and therefore seems to be different than the alien in the Ninth Circuit case. Well, with all due respect, though, Your Honor, it may be an illogical result in this case. I wouldn't concede that. But when you're looking at not applying Chevron to avoid that absurd result, you're looking at the statutory interpretation as a whole. And the statutory interpretation in this case, that an alien inadmissible under Section 212A9B is not eligible for adjustment of status under Section 245I, is a reasonable interpretation of the statute. Yeah, but that's easily avoided. We can do that in the drafting. That in this case, as applied to this alien, the BIA's interpretation of the statute leads results in an illogical – gives us an illogical result. And therefore, as applied to this person, no Chevron difference is due. That's a matter of drafting. That's easy. It's easy, Your Honor, but I think it dodges the ultimate question, whether the Board's interpretation of statutory provisions is reasonable. And if that interpretation is reasonable, it must be applied across a range of aliens that present that legal issue. Should we look at the result of their interpretation in determining whether or not their interpretation is reasonable? Should we look at what it does? What's the end result? Well, Your Honor, the end result is going to be different depending on the case. In this case, your opinion is – That's why I asked the question. In your opinion, in this case it's illogical, but across a range of other applications it wouldn't be illogical. I assume that your supervisor's not here. We can destroy the tapes. You won't be held to this. But in your opinion, is it logical to do this to this person just because you can do it? Theoretically, you may be able to do it, put it that way. Is it logical to do it here? After giving her this piece of paper, allowing her to leave? After an employer wants her to stay, she has a job. She's going to be paying taxes. It's not like this country doesn't need the revenue. Is it logical to do it? I don't think there's anything illogical, although I'm certainly not ignorant of the sympathy. Is it fair? It is what it is, Your Honor. She's inadmissible under the charge of provision.  Do we owe any deference to the BIA's reading of the notice, that is, that it did put her on notice? I mean, your common sense reading says that you will be okay, and that's why you're getting this advanced parole. So you will. The whole point is to get back in legally without a problem. Well, it certainly doesn't say you will be okay. You will be permitted to be paroled in the United States, which petitioner was permitted to be paroled in the United States. And then what's the next sentence? You may be found inadmissible if you fall. It doesn't say provided, however. It doesn't say except. It doesn't say it cites some bizarre provision without saying what it has to do with anything. And, you know, common sense, a lot of people, just plain old people are reading this, and it says this will enable you to re-enter lawfully. End of game. It does not say that, and I apologize, Your Honor, for that forceful retort. Read the language then. That's exactly how it says. I only say that because parole isn't a lawful admission. When you're paroled, you're able to be you, in essence, come back into the country. Where's the language in your brief? The language for the citation. And we don't have to defer. The notice is on page 305 of the administrative record. I believe the language is included in petitioner's brief, but not in mine. But I don't think you defer to that language because I don't think any interpretation of the statute turned on the board's interpretation of that language in the notice. There's no issue pertaining to the notice. No, we have an unusual situation here. We have someone who is coming in with advance parole and being advised that either being advised or not advised that everything's okay. And I'm just saying I don't know that that notice read. Your Honor, if I may. Yeah, yeah, yeah. It's here somewhere. Do you have the site? You have the administrative record. Yeah, I do have the administrative record. But, again, that notice makes very clear that although you will be paroled into the United States to pursue your adjustment application, which petitioner was? She was paroled in to pursue that application. There may be consequences attended upon the fact that you had departed and are now again coming into the United States to pursue that adjustment application. You said that very well. I'm just not sure that the notice is quite that clear. Your Honor, if you'd like, I can read the notice. Yeah. The notice to applicants states that presentation of this authorization will permit you to resume your application for adjustment of status upon your return to the United States. That happened in this case. If your adjustment application is denied, you will be subject to removal proceedings. If after April 1, 1997, you were unlawfully present in the United States for more than 180 days before applying for adjustment, you may be found inadmissible under Section 212A9Bi. And to paraphrase the remainder, it states that if you are so found inadmissible, you will need a waiver in order to be granted adjustment of status. But, see, when you say she can come in and pursue her adjustment of status, that would lead me to believe that there's really not going to be much change. Things will just continue as they are. And if the second and third sentences weren't there, I would agree with you. I'm just not sure that Section B1 tells the normal person that there's a problem. I don't think the bold citation of the statute would put Petitioner on notice. What puts her on notice is the clear language that if you have been present unlawfully in the United States for a period greater than 180 days, you may be found inadmissible. And that language unquestionably would have applied to Petitioner, that put her on notice that although you may travel, although you will be permitted to return and pursue your adjustment application, there will be consequences, or there may be consequences, attendant upon that departure from the United States. And the waiver, as you stated, if you're found inadmissible, you will need to qualify for a waiver of inadmissibility. And that's at the discretion of the Attorney General? It is, Your Honor, and only for aliens who can establish a certain qualifying familial relationship. This again goes to the intent of 245I, which was family reunification in the wake of certain concerns that had arisen in the 1980s. But I would also like to address the notion of the waiver in the context of why the Seventh Circuit's decision is inappropriate. For one of the many reasons I believe that decision to be inappropriate. The end result of the Seventh Circuit's decision is to, in essence, read an implicit waiver of inadmissibility into the statute. It says aliens who are inadmissible under Section 212A9B may apply for adjustment of status. There is otherwise no indication that that should be the result in 245I or Section 212. And the fact that Congress has consistently and explicitly provided waivers for inadmissibility under this provision argues strongly that aliens inadmissible under 212A9B should not be eligible for adjustment of status under Section 245I in the absence of one of these qualifying waivers. So you end up with a situation where somebody who overstays their visa is in a worse situation than somebody who enters illegally repeatedly? I'm sorry. You're in a better position. Yes. Is the person who enters illegally in a better position now than a person who comes who overstays their visa? Under the Seventh Circuit's interpretation, that could be a result. If you can make it into the United States illegally and then apply for adjustment of status, that's one of the concerns. No, no. Under the INS interpretation. Am I reading the statute wrong? That is, does a person who enters the United States illegally have a better chance of staying here and not getting barred than a person who overstays their visa? I don't believe so, Your Honor, because both those classes of alien, if that's the only violation in their past, fall within 212A6AI, I'm sorry for the jargon, which is the provision that aliens present in the United States without having been admitted or paroled are inadmissible, but all that class of aliens retain their eligibility to seek 245I adjustment of status. And, Your Honor, that's for historical reasons. When 245I was enacted in 1994, there was no ground of inadmissibility pertaining to aliens in the United States on lawful. That was added only in 1996. So in large part, the Board's precedent decision in the matter of Lemus gave voice to this historic precedent. It states that these aliens will retain their eligibility to apply for adjustment of status because this is the exact class of alien that 245 was instituted to protect. Can I ask a question? It doesn't seem to have been troubling, and I don't know if it troubled the appellant much, but it troubled me. The heading to this provision says, aliens previously removed. And the language is talking about departed or removed. Now, very often instead of removing, you allow someone voluntary departure so that they're not technically removed. And it seems to me that this whole provision should be read to apply to people who have not just left the country. They use the word departed. And I would read the provision to say that if somebody's been in proceedings and they do this stuff, they come back in or they seek admission after they've been here for a year, that that's really what this is aimed at, because they use the word departed or removed. But the BIA and the IJ said, no, departed, we're not reading it that narrowly. It really means anybody who leaves. And I don't think that makes sense. I think in this context, departure is basically a term of art. It's the flip of removal, but it means as a result of a proceeding, you've been told you have to leave. Why shouldn't we read departed or removed as applying to that class who's been kicked out and tries to come back again? It would get to a logical, a much more logical result. Much more logical. I'm not entirely certain it is, Your Honor. It's almost holding the people who haven't been put into proceedings by the agency that they better suddenly be aware of what's going on. Anyway, answer the question if you would. I think the appropriate term of art, if voluntary departure would have been intended, would be something like an alien has been removed or departed under an order of voluntary departure. Both the Seventh and the Tenth Circuits have upheld the Board's interpretation that departure encompasses more than removal or more than a departure in conjunction with removal proceedings. And I think the use of departure there does speak to a broader definition than a narrow reference to voluntary departure. See, I don't get that. I think you'd say someone who's left the country. I also don't think the notice really says if you step one foot out of this country, you are in big trouble. Don't go to Niagara Falls. You know, before getting on that plane, consult with an attorney because that's the step that's going to doom you. Not you're trying to get back in and you have then a B-2. No. If you step one foot out of the country, you are in big trouble. It's step one foot out and return within a set period of years. Yeah, but the real problem is if you step out. You've already then, you know, doomed yourself. And it does apply. I'd say it's a more facetious thing, but it's true. Someone goes to Niagara Falls, excuse me, and they're looking at the falls and they're told by everyone who's ever seen the falls, the view from the Canadian side is much more dramatic. So they go across the bridge to get the view from the Canadian side for 10 minutes. Well, now they're caught. They cannot come back in. They're falling victim to this statute. Your interpretation, the BIA's interpretation gives us that result. And given that result, which cannot possibly be what Congress intended in the case of someone who came in legally, why in the world should we defer to Chevron? Because it does yield, in some cases, I agree with you, not in all cases, but it does yield in some cases, and in the case before us, really irrational results. I think to answer that question, Your Honors, you simply have to step back from the case itself and do the legal interpretation, the Chevron interpretation. You have to gauge whether the board's interpretation of this specific inadmissibility provision squares with the congressional intent of Section 245I. And the bottom line is that it does. The board's decision in the matter of LEMAS exactly effectuates congressional intent behind the enactment of Section 245I. And the bottom line is that inadmissible aliens such as Petitioner would have never been eligible for Section 245I relief absent the amendments in 1996, which added all these new grounds of inadmissibility. The board's interpretation is reasonable, entitled to deference before this Court. Your Honors, I see my time has expired. I'm happy to answer any further questions. I'm not sure we have any. Mr. Cusher is anxious to enter the realm of possibility. If I may approach. I'll try to keep this brief. Just two quick points. When we were examining the wording of the notice, one word was misstated, and I'll very briefly go over that. Presentation of this authorization will permit you to resume your application for adjustment of status. Speaking a moment ago, the word pursue was used. And those are two very different words. Resume is what's written in the notice. Resume to me means it just continues and without interruption. Pursue has perhaps a different meaning. Well, maybe you'll get it. You pursue something. Maybe you get it. Maybe you don't. But resume to me is nothing stops, nothing broke. It's going to keep going. Good point. But how about the other point that's raised? The make laws. That says you may be found inadmissible. Correct. It does say may. But I think the words will. But doesn't that tell you that you do it at your peril? That's the way I read it. I understand. Again, I would stress the word will is a stronger word than may. Well, it is. But it means you're taking your chances. And the last point briefly to touch upon, the waiver concept was mentioned. Misterisha is not eligible for a waiver. Some persons are. It has nothing to do with 245i. There are separate waivers in the 212 statute. The waiver in this case would require a spouse who is a permanent resident or a citizen or a parent who is a permanent resident or a citizen, not children. Criminal waivers, you could perhaps have a child who might qualify. But you would have to show hardship to a spouse or a parent only. It's a very, very restrictive waiver. No other person. And unless you have a spouse or a parent who's a permanent resident or a citizen, you're not eligible to file the waiver. Does the Attorney General have any other discretionary authority to adjust status? I would argue the Attorney General has tremendous discretionary authority because of the word may here that they could decide to adjust even without a waiver. But certainly the waiver provision that's found in the section 212 does require that spouse or parent.